# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

J.P. MORGAN SECURITIES LLC,

               Plaintiff,

vs.

ASGHER ALI,

               Defendant.

Civil Action No. 2:26-cv-09006

## COMPLAINT
## (INJUNCTIVE RELIEF SOUGHT IN AID OF ARBITRATION)

Plaintiff J.P. Morgan Securities LLC ("JPMorgan" or "Plaintiff"), files this Complaint and Application for Temporary Restraining Order and Injunctive Relief against Defendant Asgher Ali ("Ali" or "Defendant"):

### Preliminary Statement

1.　This action is for a temporary restraining order and a preliminary injunction to maintain the status quo pending resolution of an arbitration proceeding between JPMorgan and Defendant that concurrently is being filed with FINRA Dispute Resolution.[1]

---

[1]　JPMorgan has the express right to seek temporary injunctive relief before a court of competent jurisdiction pending the outcome of arbitration before a full panel of duly-appointed arbitrators pursuant to Rule 13804 of the Code of Arbitration Procedure for Industry Disputes of the Financial Industry Regulatory Authority ("FINRA"), which is the self-regulatory organization that regulates broker-dealers and registered representatives who hold securities

2.     This dispute arises out of Defendant's resignation from JPMorgan on July 6, 2026 and the immediate commencement of his employment with Wells Fargo Clearing Services, LLC ("Wells Fargo"), a direct competitor of JPMorgan.  Defendant was employed by JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), an affiliate of JPMorgan, and his securities licenses were held by JPMorgan.  At the time of his resignation, Defendant worked as a Private Client Advisor in a JPMorgan Chase bank branch office in Franklin Park, New Jersey.

3.     Ali entered into at an agreement with JPMorgan that contains post-employment restrictive covenants prohibiting him from soliciting JPMorgan's clients for a period of one year after the termination of his employment, and requiring him to maintain the confidentiality of JPMorgan's confidential and proprietary business and client information.

4.     Since resigning from JPMorgan and joining Wells Fargo, Defendant is soliciting JPMorgan clients, including calling them on their personal cell phones, to move their accounts from JPMorgan to him at Wells Fargo.  Clients have informed JPMorgan that Defendant's communications have been more than simply announcing his change of employment; he is actively seeking to induce them to do business with him at Wells Fargo.

---

licenses, and is overseen by the Securities and Exchange Commission. A copy of FINRA Rule 13804 is annexed as Exhibit A to the accompanying Declaration of Anthony Paduano.

2

5. One client informed JPMorgan that Ali asked the client if they would be moving their relationship. When the client responded that they would have to think about it, and would only make a decision after they met the new JPMorgan Private Client Advisor, Ali told the client that because of his "bump up" at Wells Fargo, he has more leeway with fees and more products that he can offer clients. Specifically, he offered the client to reduce their fee by 10-20 basis points (*i.e.*, a 10th to a 5th of a percent).

6. Another client informed JPMorgan that Ali said that he received a "double promotion" to Managing Director, which allows him to give his clients better products and rates. Additionally, the client said that Ali offered to reduce the client's fees at Wells Fargo by 50%.

7. Another client informed JPMorgan that Ali told him that there is always going to be turnover at JPMorgan, so if you stay at JPMorgan you are constantly going to get someone new, but you already know me so just stay with me.

8. Another client informed JPMorgan that Ali called her and invited her to a meeting, telling her that he can show her the different things he can do at Wells Fargo. Ali also suggested to the client that the new Private Client Advisor assigned to the client did not have a lot of experience as a financial advisor.

9.     Another client informed JPMorgan that Ali called him twice, asking him to bring his accounts to Ali at Wells Fargo.  Ali also told the client that the fees are better at Wells Fargo, and that his "promotion" gives him the ability to do a lot more for the client.

10.     Another client informed JPMorgan that Ali told him that he could give him the same investments and lower fees at Wells Fargo.

11.     Another client had set up an appointment with the new JPMorgan Private Client Advisor – after telling the advisor that he would not leave JPMorgan – but then the client canceled the meeting.  The new advisor followed up and called the client, who informed him that Ali asked the client to move his relationship to Wells Fargo.

12.     Another client informed JPMorgan that Ali called him multiple times and offered to meet with the client to talk about better products for the client, his household and his business, and offered him a 20 basis point discount of the fees he would be charged at Wells Fargo, and even offered the client sports tickets.

13.     Another client informed JPMorgan that Ali called him multiple times and offered him lower fees and access to initial public offerings, which is something Ali told the client that JPMorgan can't offer.

14.     Another client informed JPMorgan that Ali called him and asked to meet.

15. In addition, on information and belief, Defendant improperly took with him to Wells Fargo JPMorgan's confidential client information, including client contact information such as cell phone numbers, which, on information and belief, are generally not publicly available, without which he would have been unable to immediately commence calling and soliciting JPMorgan clients as soon as he resigned from JPMorgan.

16. As discussed in more detail below, Ali engaged in highly suspicious computer access on JPMorgan's system in the months leading up to his resignation. The client profiles accessed by Ali contain highly confidential client information, including client names, addresses, email addresses, phone numbers, and other information needed to contact and solicit JPMorgan clients upon his departure.

17. Unfortunately, it appears that Defendant's improper solicitation efforts have proved successful, as at least three JPMorgan households with assets totaling approximately $4.8 million already have transferred from JPMorgan to Defendant at Wells Fargo.

18. At the time he left JPMorgan, Defendant serviced approximately 469 JPMorgan households/clients, virtually all of which were either pre-existing JPMorgan Chase and JPMorgan clients at the time they were assigned to Defendant, or were developed by Defendant at JPMorgan. Private Client

Advisors like Defendant sit in JPMorgan Chase bank branches, and JPMorgan Chase clients are referred to them to provide JPMorgan products and services. The clients serviced by Defendant at JPMorgan had a total of approximately $300 million in total assets under management. Defendant now seeks to improperly induce such JPMorgan clients to follow him to Wells Fargo.

19. Defendant's conduct constitutes a breach of his employment agreement (which contains non-solicitation and confidentiality provisions) and a violation of his common-law obligations to JPMorgan.

20. To prevent continued irreparable harm arising from Defendant's course of misconduct, JPMorgan seeks immediate injunctive relief (in the form of a temporary restraining order and a preliminary injunction) barring Defendant from soliciting JPMorgan's clients, and barring Defendant from further using and compelling the return of JPMorgan confidential client information, pending resolution of JPMorgan's claims against Defendant in a related arbitration that JPMorgan is in the process of commencing.

## Jurisdiction and Venue

21. The Court has jurisdiction in this action pursuant to 28 U.S.C. § 1332(a) in that, as alleged below, plaintiff JPMorgan, on the one hand, and Defendant, on the other hand, are citizens of different states, and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

22.　Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a), in that all of the events giving rise to the claims occurred in Middlesex County, New Jersey, which is in the vicinage of Newark in this judicial district.

**The Parties**

23.　Plaintiff JPMorgan is a Delaware limited liability company and a national broker-dealer, with its principal place of business in New York City, New York.  The sole member of JPMorgan is J.P. Morgan Broker-Dealer Holdings Inc., which is a Delaware corporation with its principal place of business in New York, New York.  JPMorgan is a member firm of FINRA.

24.　JPMorgan, through Chase Wealth Management, provides traditional investment services in New Jersey to JPMorgan Chase and JPMorgan clients.  Unlike traditional brokerage firms (where clients are serviced almost exclusively by one financial advisor), JPMorgan's Chase Wealth Management adopts a team approach to service a wide variety of JPMorgan clients' investment needs.

25.　Defendant is an individual who at all times relevant herein was employed and/or conducted business in New Jersey, and was and is a citizen of New Jersey.  Defendant worked at JPMorgan in its Edison branch office, and is now employed by Wells Fargo in its Oakhurst, New Jersey office.  Defendant maintains securities licenses through FINRA.

26.     In connection with his status as a registered representative of JPMorgan, Defendant executed a Form U-4 Uniform Applications for Securities Industry Registration or Transfer.  By executing the Form U-4, Defendant agreed to submit to arbitration before FINRA disputes, claims and controversies arising between himself and JPMorgan.

## Factual Allegations

27.     In May 2019 Ali commenced employment with JPMorgan Chase as a Relationship Banker.  Ali was a Relationship Banker with JPMorgan Chase from May 2019 through May 2020, when he was promoted to a Private Client Banker, a role he was in until September 30, 2021.  While Ali was a Relationship Banker and then a Private Client Banker, he worked on the "bank" side of the business and did not manage any clients' investments.

28.     On October 1, 2021, Ali transitioned from the "bank" side of the business to the "investment" side, becoming a Private Client Advisor.  In January 2023, Ali moved (as a Private Client Advisor) to a JPMorgan Chase bank branch in Edison, New Jersey, where he worked until he resigned on July 6, 2026.

29.     In May 2019, in connection with becoming a Relationship Banker, Ali entered into a Chase Wealth Management Supervision, Arbitration, Confidentiality and Non-Solicitation Agreement (the "Non-Solicitation Agreement"), which contains provisions prohibiting him from soliciting the firm's

clients for a one-year period after the end of his employment and requiring him to maintain the confidentiality of the firm's confidential and proprietary business and client information.  A true and correct copy of the Non-Solicitation Agreement is annexed to the Mascia Declaration as Exhibit A.

30.    As a Private Client Advisor, JPMorgan Chase referred its bank clients to Ali in order for him to build JPMorgan's relationship with such clients. Ali sat at his desk at a JPMorgan Chase bank branch and was introduced to hundreds of existing bank clients (with or without investment accounts) to offer and provide access to investment opportunities through Chase Wealth Management.  As a Private Client Advisor, Ali was not expected to engage in cold calling or attempt to build a client base independent of referrals from JPMorgan.

31.    Virtually all of the clients Ali serviced at JPMorgan were pre-existing JPMorgan Chase and JPMorgan clients who were reassigned to Ali, were long-term JPMorgan Chase clients who were referred to Ali or were developed by JPMorgan at the time they were assigned to Ali.

32.    In consideration for entering into and continuing his employment relationship with JPMorgan and executing the Non-Solicitation Agreements, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

**Defendant's Non-Solicitation Agreement with JPMorgan**

33.    As noted above, Defendant entered into an agreement with JPMorgan or its affiliates/predecessors that, among other things, contains provisions prohibiting him from soliciting JPMorgan clients for a period of one year after his JPMorgan employment ends and from using or retaining JPMorgan confidential information.

34.    Section 7(a) of the Non-Solicitation Agreement, entitled "Confidentiality," provides, in relevant part, that:

> *You understand that, by entering into this Agreement, by virtue of your position with JPMC and by the nature of JPMC's business, you have had access to, currently have access to, will have access to and will consistently and routinely be given trade secrets and confidential information related to JPMC's business. Confidential information concerning JPMC's business includes information about JPMC, as well as described further in the Code of Conduct and subparagraphs (b) and (c) below (the "Confidential Information"). You also understand that you will be provided with specialized training and mentoring that is unique and proprietary, which draws upon, relies upon and is part of the Confidential Information described herein.*

35.    Section 7(b) of the Non-Solicitation Agreement provides, in relevant part, that Confidential Information includes, but is not limited to:

> i.  *names, addresses and telephone numbers of customers and prospective customers;*
>
> ii.  *account information, financial standing, investment holdings and other personal financial data compiled by and/or provided to or by JPMC;*

10

*iii.   specific customer financial needs and requirements with respect to investments, financial position and standing; leads, referrals and references to customers and/or prospects, financial portfolio, financial account information, investment preferences and similar information, whether developed, provided, compiled, used or acquired by JPMC and/or yourself in connection with your employment at JPMC;*

\*        \*        \*

*vi.   all records and documents concerning the business and affairs of JPMC (including copies and originals and any graphic formats or electronic media);*

\*        \*        \*

*viii.   information concerning established business relationships;*

*ix.   "trade secrets" as that term is defined by the Uniform Trade Secrets Act (UTSA), which term shall be deemed to include each item of Confidential Information specifically described in this Section.*

36.    In Section 7(c) of the Non-Solicitation Agreement, Defendant again expressly acknowledged that JPMorgan's client account information contains confidential financial information, names, addresses, clients' net worth, investment objectives and similar information which is confidential, not readily known by competitors, and must be safeguarded.

37.    In Sections 7(d) and 7(e) of the Non-Solicitation Agreement, Defendant agreed to maintain the confidentiality of JPMorgan's Confidential Information, not to disclose such Confidential Information to or use for the benefit of any third party, and to return all JPMorgan Confidential Information upon the termination of his employment.

38.    In Section 8 of the Non-Solicitation Agreement, entitled "Non-Solicitation of Employer's Customers," Defendant agreed not to solicit JPMorgan's clients for a period of twelve months after the termination of his employment:

> a.    *You understand and acknowledge that JPMC considers its client and customer relationships important and valuable assets.  Accordingly, in consideration of and as a condition of your employment, continued employment, access to trade secrets and Confidential Information, specialized training and mentoring, and other consideration provided herein,* ***you understand and agree for a period of twelve (12) months after your employment with JPMC terminates for any reason that you may not on your own behalf or that of any other persons or entities, directly or indirectly solicit or attempt to solicit, induce to leave or divert or attempt to induce to leave, initiate contact with or divert from doing business with JPMC, any then current customers, clients, or other persons or entities that were serviced by you or whose names became known to you by virtue of your employment with JPMC, or otherwise interfere with the relationship between JPMC and such customers, clients, or other persons or entities.***
>
> b.    *You understand and agree that JPMC has developed and uses a unique business model for the offering of investment and bank products and services, including the Chase Wealth Management and Chase Private Client platforms.  Specifically, you acknowledge and understand that the vast majority of customers with whom you will be working with at JPMC have pre-existing investment relationships with CISC and/or pre-existing and separate banking relationships with JPMorgan Chase Bank, N.A.  Additionally, you will be working with other JPMC employees to develop and strengthen these relationships on behalf of JPMC.  The customer relationships developed at JPMC and given to you by JPMC flow directly from the goodwill,    reputation,    name    recognition,    Confidential*

*Information, specialized training, mentoring and expenditures made by JPMC.*

*c.      This section does not apply to customer relationships you established prior to commencing employment with JPMC, provided that you are able to substantiate through documents or other suitable evidence that the relationship preceded commencement of your employment with the JPMC, and any such customers are listed on Attachment A signed by your manager.*  (Emphasis added.)

39.      Although Ali had worked as a personal banker at another bank before he joined JPMorgan Chase in 2019, he did not get any of his securities licenses until after he joined JPMorgan.  Specifically, Ali did not obtain his Series 7 securities license (which permits him to recommend for sale individual securities) until after he joined JPMorgan, and did not become a Private Client Advisor until October 2021, more than two years after joining JPMorgan.

40.      Ali was permitted to identify all client relationships that he had established prior to joining JPMorgan, and those pre-existing relationships would be carved out from the non-solicitation restriction in the Non-Solicitation Agreement.  The "Attachment A" to the Non-Solicitation Agreement – the space specifically designated for listing any pre-existing relationships – is blank (meaning Ali identified no pre-existing client relationships).  Thus, on information and belief, Ali brought no clients with him to JPMorgan when he initially joined JPMorgan in 2019.

41.   In Section 10(a) of the Non-Solicitation Agreement, Defendant agreed that the above-referenced provisions are reasonable, and that he voluntarily entered into the agreement after having had an opportunity to review it with his counsel:

i. *You acknowledge that you have carefully considered the nature and extent of the restrictions upon you and the rights and remedies conferred upon JPMC under Sections 7, 8, and 9 of this Agreement, and have had the opportunity to retain legal counsel at your own expense to review this Agreement. You acknowledge that these restrictions are reasonable in time and geographic scope, are fully required to protect the legitimate interests of JPMC and its customers and do not confer a benefit upon JPMC which is disproportionate to any detriment to you.*

ii. *You acknowledge that the terms and conditions of Sections 7, 8 and 9 of this Agreement incorporate and/or supplement the terms and conditions of your employment at JPMC and are reasonable and necessary to protect the valued business interests of JPMC and that you have received good and valuable consideration for entering into this Agreement.*

iii. *You acknowledge that you were made aware of this Agreement at the time you accepted employment with JPMC or at the time you were afforded the opportunity of receiving sales-related compensation for the sale of non-deposit investment products, and that you are signing it knowingly and voluntarily and are accepting or continuing employment with full understanding of its terms and conditions. You further acknowledge the reasonableness and enforceability of the terms of this Agreement, and you will not challenge the enforceability or terms of this Agreement.*

42.    In addition, in Section 10(b) of the Non-Solicitation Agreement, Defendant acknowledged that any breach of the provisions set forth above will cause irreparable harm to JPMorgan entitling it to seek immediate injunctive relief and to recover its attorneys' fees in connection with instituting any legal proceeding and/or arbitration to enforce the Non-Solicitation Agreement.

43.    In consideration for entering into and continuing his employment relationship with JPMorgan and executing his agreement with JPMorgan, Defendant was provided with significant benefits, including substantial compensation, office and support facilities, securities registration, research, and health insurance.

**<u>JPMorgan's Relationship with its Clients and its Confidential Information</u>**

44.    JPMorgan has invested substantial time and money, totaling millions of dollars, to acquire, develop and maintain its clients over many years.  It is with great difficulty, and only after a great expenditure of time, money and effort, that JPMorgan was able to acquire its existing clients.  JPMorgan spends substantial resources in gaining knowledge about its clients and protecting the privacy of such information.  It typically takes many years of dealing with clients for JPMorgan to become their primary investing firm.  JPMorgan clients typically remain with and continue to be serviced by the firm, regardless of whether the Private Client Advisor or other team members resign or leave JPMorgan.  But for

Ali's employment with JPMorgan, he would not have had any contact with virtually any of the clients the firm assigned to him and whom he is now soliciting.

45.    During the course of his employment with JPMorgan, Ali had access to highly confidential JPMorgan client files in addition to other financial information that is confidential and proprietary to JPMorgan.  JPMorgan's client files contain confidential financial information regarding each client, including client identity, address, telephone numbers, transactional history, tax information, personal financial data, banking information and investment objectives, among other confidential and proprietary data.  Ali had no interaction with virtually any of the clients he was assigned at JPMorgan (and no knowledge of any of their confidential information) until he started working at JPMorgan.  As indicated above, this information has been collected at great expense to the firm, is not easily duplicated, and would be extremely valuable to a competitor.

46.    A critical factor to JPMorgan's continued success is its relations with its clients.  JPMorgan has built the loyalty of its client base through many years of effort and has invested substantially in building JPMorgan's goodwill. JPMorgan spends substantial resources in terms of time, effort and money annually to provide programs and support to its Chase Wealth Management advisors, including Ali, for them to use to obtain and build relationships with its clients.

47.    JPMorgan's records maintained concerning its clients are not available from other sources and have been created and updated for a period of many years based on JPMorgan's relationship with its clients.  JPMorgan has invested substantial corporate resources to develop and maintain its client information.   Virtually all of the JPMorgan clients that Ali serviced were developed by JPMorgan at great expense and over a number of years.  JPMorgan's client list is the lifeblood of its business and the expenditures incurred by JPMorgan in obtaining its clients include the millions of dollars spent by JPMorgan every year on national and local advertising and marketing, the millions of dollars it costs to train JPMorgan's employees, and the many other expenditures JPMorgan incurs in maintaining its goodwill in the industry.

48.    JPMorgan also has expended significant resources to service its clients.  These resources include millions of dollars a year JPMorgan spends for support staff, clearing services, operations personnel, systems and support, management and compliance supervision, salaries, annual registration fees, computer services and equipment, phone, mail, research, literature, seminars, trade and other professional news publications, promotional events, securities research and analysis, and other services.  JPMorgan has borne the entire expense of these services and activities as well, with no financial contribution from Ali.

49.    JPMorgan employs reasonable efforts to maintain the confidentiality of its client records.  Specifically, access to the records is restricted to those employees whose jobs require them to refer to this information, duplication of the records is prohibited and there are constant reminders about the confidential nature of the information contained on the records.  Advisors such as Ali must maintain JPMorgan's client information as strictly confidential.  These instructions are confirmed in the agreement referenced above.

### Defendant's Misconduct

50.    As noted above and incorporated herein, Defendant resigned from JPMorgan on July 6, 2026, immediately joined Wells Fargo, and began soliciting JPMorgan clients.

51.    As set forth above, numerous JPMorgan clients have informed JPMorgan that Defendant has asked them to transfer their business to him at Wells Fargo or asked for meetings with the clients to discuss Wells Fargo.

52.    Defendant's solicitation of JPMorgan clients is ongoing and continuing.

53.    On information and belief, without misappropriating JPMorgan's confidential client information, Defendant would not have had clients' personal cell phone numbers, and would not have had the ability to call JPMorgan clients immediately after he resigned.

18

54.    Ali engaged in extensive highly suspicious computer access of JPMorgan's systems in the months leading up to his resignation, many in the middle of the night.  For example, on June 10, 2026, less than four weeks prior to his resignation, Ali accessed approximately 163 client profiles on JPMorgan's Advisor Central system, the majority of them in rapid succession (*i.e.*, 1-2 minutes apart).

55.    There is no legitimate business reason why Ali would need to access so many client profiles, especially those he did in rapid succession.

56.    The client profiles accessed by Ali in the months preceding his resignation contain highly confidential client information, including client names, addresses, e-mail addresses, phone numbers, dates of birth, account numbers, account types, account balances and specific investment holdings.  On information and belief, Ali took such client information with him from JPMorgan to his new firm (by taking photos of the computer screens with his cell phone, copying, by intentionally trying to memorize the information, or via some other means), and is using such information at Wells Fargo to aid in his solicitation of JPMorgan clients.

57.     Unless Defendant's misconduct is immediately restrained and enjoined, other competitors of JPMorgan will be encouraged to engage in the same kind of improper behavior with complete impunity, the result of which will inflict severe and permanent damages on JPMorgan.

58.     Defendant's misconduct, as described above, constitutes at a minimum, breach of contract, breach of fiduciary duty and duty of loyalty, tortious interference, and unfair competition.  Unless Defendant's conduct is immediately enjoined, JPMorgan's other employees will be encouraged to engage in the same improper conduct.  This misconduct is highly disruptive to JPMorgan's ability to conduct business in a stable manner and to maintain JPMorgan's goodwill with its clients.

59.     By improperly soliciting JPMorgan's clients, Defendant has caused and will continue to cause continuing and irreparable injury to JPMorgan which cannot be cured by monetary damages.  Defendant's wrongdoing has caused and will continue to inflict irreparable harm to JPMorgan by causing:

    (a) Loss of JPMorgan clients and loss of clients' confidence;

    (b) Injury to JPMorgan's reputation and goodwill in the New Jersey market;

    (c) Use and disclosure of JPMorgan's trade secrets and confidential and proprietary information, including client lists;

(d) Damage to office morale and stability, and the undermining of office protocols and procedures; and

(e) Present economic loss, which is unascertainable at this time, and future economic loss, which is now incalculable.

## FIRST CAUSE OF ACTION
### (Breach of Contract)

60.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 59 hereof.

61.    Defendant breached his agreement with JPMorgan by soliciting JPMorgan's clients and by, on information and belief, taking and using JPMorgan's confidential documents and information.  By soliciting JPMorgan's clients and using and disclosing JPMorgan's proprietary and confidential information, Defendant seeks to convert to his benefit JPMorgan's protectable interests.

62.    JPMorgan has performed all of its duties under all such contract.

63.    JPMorgan has been injured and will continue to be injured by Defendant's breaches of his agreement with JPMorgan in an amount which cannot readily be ascertained or compensated by money damages.

64.   As a direct and proximate result of Defendant's breaches of his agreement, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SECOND CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

65.   JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 64 hereof.

66.   JPMorgan's confidential and proprietary business and customer information derives substantial, independent economic value from not being generally known to the public or to JPMorgan's competitors, who could obtain economic value from the information.  JPMorgan expended substantial financial and human resources to develop this information, which cannot be easily acquired or replicated by others, from among the literally millions of actual or potential individual investors in the marketplace.  Further, JPMorgan has taken substantial efforts to maintain the secrecy of its confidential and proprietary business and customer information, including but not limited to restricting access to such information, designating such information as confidential, and requiring confidentiality agreements.  Accordingly, JPMorgan's confidential and proprietary business and customer information constitutes trade secrets pursuant to the New Jersey Trade Secrets Act.

22

67. Defendant misappropriated JPMorgan's trade secrets and confidential information and utilized the information to contact and solicit JPMorgan clients to transfer their assets and business to them at his new firm. Defendant has engaged in such activities without the express or implied consent of JPMorgan and, indeed, in violation of his agreements prohibiting such conduct. Defendant engaged in this conduct despite the fact that he knew or had reason to know that his knowledge of JPMorgan's trade secrets and confidential information was acquired under circumstances giving rise to a duty to maintain its secrecy and to limit its use.

68. As a direct and proximate result of Defendant's misappropriation of JPMorgan's trade secrets, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## THIRD CAUSE OF ACTION
### (Conversion)

69. JPMorgan realleges and incorporates herein by reference, the allegations of paragraphs 1 through 68 hereof.

70. At all times, JPMorgan was, and still is, entitled to the immediate and exclusive possession of its trade secrets and other proprietary information, and all physical embodiments thereof, as alleged above.

23

71.    JPMorgan is informed and believes that Defendant took JPMorgan's trade secret and other proprietary information, including but not limited confidential client contact information, and converted such information for his use and those acting in concert with him.

72.    The continued detention of JPMorgan's personal property by Defendant constitutes conversion.

73.    As a direct and proximate result of Defendant's conversion, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated.  Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FOURTH CAUSE OF ACTION
### (Breach of Fiduciary Duty and Duty of Loyalty)

74.    JPMorgan realleges and reincorporates herein by reference the allegations contained in paragraphs 1 through 73 hereof.

75.    As an employee of JPMorgan, Defendant owed JPMorgan a fiduciary duty of trust and an undivided duty of loyalty.

76.    Defendant's duty of loyalty and fiduciary duties required him at all times to, among other things, act in JPMorgan's best interests and maintain the confidentiality of JPMorgan's trade secrets and other confidential and proprietary business and customer information.  Defendant's duty of loyalty and fiduciary duties required him at all times to refrain from, among other things,

24

misappropriating JPMorgan's confidential information and soliciting JPMorgan's clients to join him at a competing company.

77.    Defendant breached his duty of loyalty and fiduciary duties to JPMorgan by engaging in the conduct alleged above.  Defendant engaged in such wrongdoing prior to the termination of his employment from JPMorgan and after he joined JPMorgan's competitor, Wells Fargo.

78.    As a direct and proximate result of Defendant's breaches of his duty of loyalty and fiduciary duties, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## FIFTH CAUSE OF ACTION
**(Intentional and/or Negligent Interference with Actual and Prospective Economic Advantages)**

79.    JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 78 hereof.

80.    JPMorgan has developed and maintains advantageous actual and prospective business relationships with its clients that promise a continuing probability of future economic benefit to JPMorgan.

81.    JPMorgan is informed and believes, and on that basis alleges, that Defendant knew or reasonably should have known about JPMorgan's advantageous actual and prospective business relationships with its clients.

82.    JPMorgan is informed and believes, and on that basis alleges, that Defendant has intentionally, maliciously and improperly interfered with and continues to interfere with JPMorgan's relationships with its clients by, among other things, directly and/or indirectly attempting to induce JPMorgan clients to sever their relationships with JPMorgan and to induce them to join him at his new employer.

83.    There was no privilege and justification for Defendant's conduct.  Moreover, Defendant's actions also constitute wrongful conduct above and beyond the act of interference itself, including misappropriation of trade secrets, breach of contract, unfair competition, breach of his fiduciary duty, and breach of his duty of loyalty.

84.    Defendant's conduct was and continues to be improper, willful and malicious.

85.    As a direct and proximate result of Defendant's tortious interference with actual and prospective business relationships, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which

26

cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

## SIXTH CAUSE OF ACTION
### (Unfair Competition)

86. JPMorgan realleges and incorporates herein by reference the allegations of paragraphs 1 through 85 hereof.

87. Defendant's conduct as set forth above and incorporated herein is unlawful, unfair, fraudulent and deceptive, and constitutes unfair competition.

88. As a direct and proximate result of the Defendant's unfair competition, JPMorgan has sustained and will continue to sustain irreparable injury, the damages from which cannot now be calculated. Accordingly, JPMorgan is entitled to a temporary restraining order and a preliminary injunction.

WHEREFORE, JPMorgan respectfully requests that a judgment be entered in its favor against Defendant as follows:

A. In support of all claims for relief, a temporary and preliminary injunction lasting until such time as a duly appointed panel of arbitrators at FINRA renders an award in the underlying dispute on JPMorgan's claim for permanent injunctive relief after an evidentiary hearing, enjoining and restraining Defendant, directly or indirectly, and whether alone or in concert with others, including but not limited to the directors, officers, employees and/or agents of Wells Fargo, from:

27

(a) soliciting, attempting to solicit, inducing to leave or attempting to induce to leave any JPMorgan client serviced by Defendant at JPMorgan or whose name became known to Defendant by virtue of his employment with JPMorgan (or any of its affiliates or predecessors in interest), excluding only Defendant's immediate family members; and

(b) using, disclosing or transmitting for any purpose JPMorgan's documents, materials and/or confidential and proprietary information pertaining to JPMorgan, JPMorgan's employees, and/or JPMorgan's clients.

B.     Ordering Defendant, and all those acting in concert with him, to return to JPMorgan or its counsel all records, documents and/or information in whatever form (whether original, copied, computerized, electronically stored or handwritten) pertaining to JPMorgan's clients, employees and business, within 24 hours of notice to Defendant or his counsel of the terms of such an order.

C.     Such other and further relief as the Court deems just and proper.

Dated:  July 20, 2026

PADUANO & WEINTRAUB LLP

By:   __*/s/ Anthony Paduano*__
          Anthony Paduano
1251 Avenue of the Americas, Ninth Floor
New York, New York 10020
(212) 785-9100

Attorneys for Plaintiff
J.P. Morgan Securities LLC

28